THE WHITE COMPANY *vs.* THE CITIZENS BANK AND TRUST COMPANY.

Third Judicial District, Bridgeport, October Term, 1929.

WHEELER, C. J., MALTBIE, HAINES, HINMAN AND BANKS, Js.

Argued October 24th, 1929—decided March 3d, 1930.

*Frederick H. Wiggin,* with whom, on the brief, was *Stanley Daggett,* for the appellant (plaintiff).

*George E. Hall* and *Walter J. Walsh,* for the appellee (defendant).

HAINES, J. This is an action by an Ohio corporation with a home office at Cleveland for the recovery of the proceeds of two checks which bore the alleged unauthorized indorsement of an employee of the plaintiff, and were accepted for value by the defendant bank in New Haven. The plaintiff is engaged in the manufacture and sale of motortrucks and busses, the selling being done mainly through district and branch offices which it maintains in various cities throughout the country. Incidental to the business of these offices is the acceptance and sale of used cars and those which have been repossessed under conditional sale contracts. The checks were given for used cars and were indorsed by the manager of the used car department, Edward J. Keleher, in New Haven, and delivered in part payment for a new Cadillac car and for some champagne. After indorsement by the takers the checks were accepted by the defendant bank, cash being given for one and a credit for the other. Plaintiff claimed the indorsements by the manager were forged, unauthor-

ized and void and conferred no legal title upon subsequent holders; that the defendant was thus a mere intermeddler, and having obtained the payment of the checks from the drawee banks through the clearing house, had become liable to the plaintiff for the amount thereof.

The facts are numerous and somewhat complicated, but the trial court held and counsel concede that there are essentially but two controlling questions in the case: (a) whether Keleher had requisite authority to make the indorsements and (b) whether the plaintiff was precluded from now denying that he had that authority. The trial court answered both these questions in the affirmative.

For the presentation of these issues the appeal record is unnecessarily voluminous, containing two hundred and forty-one pages of printed testimony, with fifty-eight exhibits and one hundred and thirteen assignments of error—many of the latter duplicated and overlapping, resulting in much complication and the imposition of much unnecessary labor upon the appellate court.

There are seventy-five requests for changes in the facts found by the trial court, and such of these as we deem material we shall consider as occasion arises, but, among the unchallenged facts, are the following: For several years the plaintiff had maintained a branch office at New Haven, and about January 1st, 1927, a district office was created with its headquarters on Davenport Avenue in New Haven, and with jurisdiction over most of the State of Connecticut including the supervision of a branch office at Waterbury. For a long time Jas. W. Boyd had been manager of the New Haven branch and when this was made a district office he was appointed district manager. The plaintiff's regional vice president, who was located at Bos-

ton, had the immediate supervision of the district office. In connection with the district office, there was another called the used car department, located for a time on Grand Avenue but later removed to Chapel Street. This was under the direction and supervision of Boyd, but Keleher, who had previously been one of the plaintiff's salesmen, was made the manager of this department. While Keleher was subject to the direction and supervision of Boyd and reported directly to him, there were several salemen, drivers and mechanics in the used car department subordinate to Keleher. Prior to their appointment to their respective positions, both Boyd and Keleher had written contracts with the plaintiff, but neither had a written contract as manager. Boyd had in his possession a so-called district managers' manual containing, among other things, directions for accounting, reporting and the general fiscal management of the office. He had specific authority to indorse checks for deposit to the credit of the plaintiff in designated bank accounts in New Haven which were under the sole control of the plaintiff's officers in Cleveland. These written provisions for handling the funds of the office were designed quite as much for the plaintiff's convenience in bookkeeping and general fiscal management as for its protection against misappropriation. Both Boyd and Keleher had authority to receive funds which came to their respective offices and those received in the used car department were reported and turned over by Keleher to Boyd or the latter's cashier.

The plaintiff also employed an accountant, sent from the home office in Cleveland and permanently stationed in the district office in New Haven, besides traveling auditors, and a "Supervisor of District and Branch Office Accounting," who checked the business and accounts, and gave directions to both Boyd and Keleher as to the method of reporting sales and keeping

sales and stock records, and daily, weekly and monthly reports were sent to the home office. The regional vice president also visited the office in a supervisory capacity, as well as other representatives of the plaintiff from the home office. It further appears that Boyd was specifically authorized to expend money for the entertainment of prospective customers and others, within certain limits, and the nature and extent of the entertainment was left to his discretion. The furnishing of liquor was not forbidden by any rule of the plaintiff. It further appears from the record in the writtten contract which the plaintiff had previously made with Keleher (Exhibit H) that it was signed "The White Company, J. W. Boyd," and paragraph nine of that contract read: "None but a duly authorized executive officer of said Company shall have power to execute this contract on behalf of said Company," which forces the conclusion that Boyd was in fact then recognized as an executive officer of the Company.

One of the checks in question was for $800, drawn by the New Haven Orphan Asylum April 7th, 1927, on The Union & New Haven Trust Company, payable to the order of The White Company. It was in payment for a truck bought of the used car department and was enclosed and mailed with a letter and addressed to "Mr. E. J. Keleher, The White Company, 943 Grand Avenue." After this check left the hands of the maker, some person unknown added, after the words "The White Company" on the face of the check, the words "Used Car Dept." Thereafter Keleher indorsed this check in blank "The White Company, Used Car Dept. By E. J. Keleher, Used Car Manager," and delivered it to one Card, who was a bootlegger, $700 being in payment for five cases of champagne, which had been bought at Boyd's direction and delivered at the district manager's office, and $100 to pay for some extra truck

wheels. Card was one of a firm known as Standard Truckers, and this firm name was then indorsed upon the check by Louis Barletto, another member, who took it to the defendant bank, with which the firm was a depositor, and cashed it over the counter in the regular course of business. It was cashed by the bank in good faith and without notice of any irregularity save as might appear upon the check itself. The trial court found as a fact that Keleher indorsed the check with the knowledge and at the direction of Boyd. The plaintiff took exception to this finding on the ground that it was a conclusion from the testimony of Keleher, who was not entitled to credit. His credibility, however, was for the trial court and the conclusion is amply justified by his testimony. The second check was for $700, dated April 16th, 1927, signed by Hugh L. Jones, payable to the order of The White Company, for a secondhand truck bought of the used car department. It was drawn on the Peoples National Bank of Stamford, and was handed to Keleher by one of his salesmen. As on the other check, some unknown person added the words "Used Car Dept." after the name of The White Company and thereafter Keleher indorsed it, "Pay order Elm City Jordan Company, The White Company, Used Car Dept. Edward J. Keleher, Manager," and delivered it by direction of Boyd to the indorsee in part payment for a Cadillac car, save $148.16 which was returned to Keleher by the Jordan Company by check to his order, which check Keleher cashed and turned in to the district manager's office for credit of the plaintiff. This car was bought by Keleher at Boyd's direction, to be kept at the used car department and used in entertaining purchasing agents and prospective customers as well as for Keleher's personal use. The Jordan Company was a depositor with the defendant bank and the latter received the check on

deposit in the usual course of business and gave the Jordan Company credit therefor on its books.

The trial court further found that under their contracts of employment, all funds handled by Boyd and Keleher were trust funds for which they were bound by their contracts to account to the plaintiff, and for the purpose of such accounting the plaintiff had made Boyd its agent to indorse or cause to be indorsed all checks collected, and that Boyd had received secret instructions from the plaintiff as to the manner of accounting and forms of indorsement, and that these funds were diverted in a manner irregular and contrary to these instructions. The conclusion was reached that, so far as third parties were concerned, Boyd was "acting within the scope of his employment and within the terms of his general authority express or implied," in directing the indorsement of these two checks by Keleher for the purposes indicated.

This conclusion is earnestly contested by the plaintiff with much force and citation of authorities and we feel that justice to all parties requires consideration of some further facts developed upon the trial with special reference to the question whether the plaintiff should be allowed, as against this defendant, to set up a lack of authority on the part of its agents. It was shown that other funds had been diverted by Keleher, and at the time of the trial he was serving a term in jail, but it did not appear that these two checks were involved in his prosecution. Boyd was never arrested or prosecuted by the plaintiff. Keleher was discharged, and nearly a month afterward Boyd left the plaintiff's employ and at the time of the trial was employed in New York, but did not testify at the hearing of the present case.

It further appears that on many occasions, at the direction of Boyd, checks had been indorsed by Keleher

as used car department manager, and by the same direction had been used to pay for large quantities of liquors which, for the most part, were delivered to the plaintiff's district office on Davenport Avenue and were kept in Boyd's private office in a desk to which Boyd had the key. During 1926 and 1927, about $13,000 was thus spent for liquors and "used under Boyd's direction to further sales of the plaintiff's product." This finding stands unchallenged. Presents of liquor were made to purchasing agents and prospective customers, it was used at "Pep" meetings and dinners of the plaintiff's sales force and when the regional vice president and other high officials of the company were present, and on at least one occasion several bottles were furnished the vice president in person, though he afterward paid for it, and a large quantity was at one time used at a coal dealers' convention to promote the sale of the plaintiff's trucks for the coal business, and some was used at a dinner attended by the vice president, where the New Haven office was awarded a cup as a prize for the large volume of its sales. This purchase and use of liquors for entertainment purposes was open and continuous for more than two years and well known throughout the organization.

To meet keen competition and effect a discount from the list price of its cars it had long been the practice in the New Haven office to accept, in part payment for its cars, a secondhand car at an excessive price or to credit the customer for a so-called "phantom" or "paper" car, which was purely fictitious. These were reported as on hand and were entered on the inventory. This was a device carried on under Boyd's direction for the promotion of sales. These cars were later reported as sold and funds which were in the office were used to square the books. It was found that during a period of about two years, at least $30,000 had been used for the pro-

motion of sales at the New Haven office, largely by means of liquors and the entry of "phantom" cars. During all this time the various supervisors, accountants and auditors were checking the business of the office, and daily, weekly and monthly reports were made to the home office in Cleveland. We agree with the conclusion of the trial court, that the plaintiff knew or at least should have known of this use of its funds, of which the two checks in question were but a small part, and should be held chargeable with notice thereof.

Passing the question whether Boyd had the requisite authority, express or implied, to procure the indorsement and negotiation of these numerous checks by Keleher, he assumed the authority to do so, and the plaintiff is charged with notice of that fact. Moreover, the facts established clearly show that the plaintiff itself had the benefit of the proceeds of the two checks in question in their application by Boyd to the promotion of sales of the plaintiff's products, even though done in a manner not shown to be specifically authorized. Under these circumstances, it would be in the highest degree inequitable that the defendant should be required to respond to the plaintiff's demand for reimbursement. It is conceded that this defendant acted in good faith and in the usual course of business in accepting the checks from its depositors and has not been in any way enriched thereby.

If the plaintiff did not know of the methods employed by its agents for the promotion of its business; if it did not know that many of its checks were thus being negotiated and used by its agents for this purpose as above detailed, the fact can only be attributed to its own negligence, and knowledge should be imputed to it with the same legal result as would have followed from actual knowledge. The checks here involved are but two in a long line of similar dealings by its agents,

who were permitted for a period of two years to hold themselves out as vested with full authority to thus deal with funds in their hands.

If the plaintiff has been wronged it has been by the acts of its own agents. If it is entitled to complain, that complaint lies against those agents for violating its private instruction and for diverting trust funds which it had placed in their hands, rather than against an innocent victim of the plaintiff's misplaced confidence.

"The modern [doctrine of] estoppel . . . is of equitable origin, though of equal application in courts of law. It is much more than a rule of evidence. . . . An equitable estoppel does not so much shut out the truth as let in the truth, and the whole truth. Its office is not to support some strict rule of law, but to show what equity and good conscience require, under the particular circumstances of the case, irrespective of what might otherwise be the legal rights of the parties. The key to its application is not infrequently to be found in the rule that in matters of trust and confidence, when one of two innocent persons must suffer, in consequence of the acts of one of them, the loss must generally be borne by him who thus occasioned it." *Canfield* v. *Gregory*, 66 Conn. 9, 17, 33 Atl. 536. The plaintiff is estopped to claim reimbursement from the defendant.

Without following counsel in their long and detailed discussion of the rights and liabilities of the parties in the broad fields of agency and negotiable paper, we feel that the conclusion just referred to is supported with compelling force by the inquiry, what does equity and good conscience require in the situation presented? If we assume, without deciding, that Keleher's indorsements as the plaintiff's agent were unauthorized and that by the rules of the law merchant, the indorsements conferred no legal title to any subsequent holder as

claimed by the plaintiff, may the defendant be required to suffer the loss and the plaintiff be permitted to have the benefit of these checks for a second time?

In an early case in this State, the name of the defendant had been forged as an indorser on a note made by his brother, and the forger procured the money from the bank and invested it in goods. Upon the discovery of the forgery, the defendant succeeded in obtaining the goods and selling them at a large profit, recouped himself for the full sum he would have had to pay had the indorsement been genuine. In a suit by the bank against the alleged indorser of the note, this court said: "These goods were in reality bought with the money of the plaintiff. Neither of the Middlebrooks ever paid a dollar for them, although they have had the whole avails of a sale of them. The money was obtained of the plaintiff by fraud and on every principle of justice the goods which were bought with it ought to be regarded as belonging to the bank. These goods have been turned in to money, which is in the hands of the defendant. This verdict if allowed to stand will place the money where it justly belongs. It is unnecessary to inquire whether a verdict could legally have been obtained on this ground. The question is whether we are under any obligation to interfere with it." *Union Bank* v. *Middlebrook*, 33 Conn. 95, 100. Judgment was affirmed in favor of the bank against the party whose name had been forged upon the note.

The facts we have detailed are for the most part unchallenged, and a study of the requested changes in the finding reveals nothing which justifies any material alteration in it. The record establishes that Boyd was the general agent, in charge of the business of the plaintiff in this State, with requisite broad powers; that he expressly authorized the use of cash and checks in his hands in the manner indicated, and directed the appli-

cation of the proceeds in the furtherance of the plaintiff's business and the plaintiff is clearly estopped to claim in this action that the negotiation of these checks was illegal.

There is no error.

In this opinion the other judges concurred.